Next argued case is number 162712, United States Capitol Police against the Office of Compliance. Ms. Shindian. Good morning. May it please the Court. My name is Kelly Shindian. I represent Petitioner, United States Capitol Police. The Office of Compliance Board of Directors made the same mistake the hearing officer made in this case. It found that the department violated the Congressional Accountability Act without identifying any evidence supporting this conclusion because there is none. Today I'll talk about three things the board did wrong. First, the board determined that protected activity was a motivating factor in the department's treatment of Officer Contos. Second, the board determined that the department did not show that it had a legitimate reason for the discipline. Third, based on a number of factual findings the board made, it found that the department's reason for disciplining Officer Contos was pretextual. The board's decision is fundamentally unreasonable because there is nothing in the record supporting these conclusions. The importance of this case... The three issues that you raised sort of interconnected. Let me explain why I tend to see it that way. The action that was taken against the Mr. Contos, is that how you pronounce it? That is correct. The action was taken because he was absent without leave. That is correct, Your Honor.  That is the department's position. So we have a hearing examiner's conclusion that he was not absent without leave, as a matter of fact. That is correct. The hearing officer says he was not absent without leave. He 1301'd it or whatever. That was all approved. Officer Law came in, served the whole period, was paid for the whole period. There weren't any gaps. So he wasn't absent without leave. So the hearing examiner and then the board says, well, if he wasn't absent without leave, he can't be disciplined for being absent without leave because he wasn't absent. So why did they discipline him? Couldn't have done it because he wasn't absent on leave. Well, it must have been for some other reason. So they look and they say, well, look what happened. So you have to have a reason for having the discipline, right? That is correct. And he can't be disciplined for being absent without leave because he wasn't absent. So what was it? And they say, well, it must have been that it's his protected disclosures that he made. What else? And then they say, well, the people who gave the discipline, the police, they don't have any other explanation. So what's your explanation? Why was he disciplined? Because he can't be disciplined for being absent without leave. That's a fact finding that was made. And it seems to me there's substantial evidence to support that fact finding. The law showed up and it would be against the law to pay him for a full period of time. It would be totally against the law if he didn't do it. And so I don't understand why the agency imposed the discipline. Thank you, Your Honor. The agency imposed the discipline because Officer Consos was absent without leave, which is defined by the agency's policies as not- But what do you do with the fact finding that he was not absent? He wasn't absent. If anybody was absent without leave, it was Mr. Law, not Mr. Koska. We would disagree with that. And here's the reason why. How could you disagree with that? He got a substitute. He got a substitute. All the cases you've cited, all 18, 19, 20 cases, there's plenty of evidence of officers who were 1301 who didn't show up on time and they got disciplined, not the person for whom the person stood in. So there are several points that address your question. The first is that Officer Consos was, in fact, absent without leave. That is, he was ordered to report for duty following his regular shift, which ended at 7 a.m. He failed to report at that time and left. It was excused. No, he was not excused. He was told to report for duty. We're talking across each other. The way this works, as I understand it, is a hearing officer takes evidence and makes findings of fact, and then the board reviews those findings of fact. That is correct. And my understanding is that we review a finding of fact for substantial evidence. That is correct. Right? And so the data points that were argued as substantial evidence in support of no absent without leave was there's a 1301. Is that the right number? That is the form, correct. There's a 1301 policy. It's consistent. If somebody else steps up to serve your stint, then you're excused that this officer was told he could 1301. In fact, a 1301 happened. A man named Law came and served. A man came, and there was like an 18-minute or 20-minute gap in the time between when he signed in and when he should have been for a full thing. But there's no argument. He was paid the full amount of time. He was paid for the time in which he worked. And so let me back up for a second and again. He was paid for the full. He didn't have a deduction for the 29 minutes he wasn't there. He was paid from the moment he clocked in, which was at 7.29 a.m. But let me back up and address the points that you've raised. The issue here is whether or not for those factual findings, the Office of Compliance, Board of Directors, and the Hearing Officer had substantial evidence supporting those findings. The first issue, what's missing from the Hearing Officer and the Board's conclusions is, number one, Officer Consos was, in fact, absent without leave. There's a policy that defines what that requirement is. If you do not report for duty at the time, date, and place ordered without the consent of a supervisor, you are considered absent. So the absent without leave time period is 18 minutes? It's the absent without. You need to tell me that because I need to know what. Sure. The absent without. There was a substitute, Mr. Law, who came and served. Eventually, a substitute came in to work Officer Consos' shift. That substitute stated. What was the time period for the eventually? I'm getting to that. The substitute specifically stated he did not work, he did not report for duty until 8.15. That is, he clocked in at 7.29 a.m., but did not report for duty at the Capitol Division until 8.15. Well, that's because the doors didn't open until 8.15. That's incorrect, Your Honor. That is correct or incorrect? That is incorrect. So Officer Law was assigned a post when he eventually did report for duty. When you say it's incorrect, that fact was in the gamish of all of the evidence. Did you challenge that fact in front of the Board after the hearing examiner? We did. So one of the issues that was raised by the Board and by the hearing officer was that at 7.15 a.m. it was okay for Officer Consos to leave his post because his next post wouldn't have been until 8.15. That is not what Officer Consos testified to. Officer Consos specifically said he assumed his next post would be building control, which is a post. It just happens not to be a stationary post. It's a mobile post, and so for that reason, because it's not stationary, he described it as a quasi-break. Can we go back to the post? Officer Law clocked in at 7.29. He did. So what was he doing between 7.29 and 8.15? All that we know is that Officer Law clocked in at 7.29 at the U.S. Capitol Police's headquarters, which is about a quarter of a mile away from the Capitol Division where he would have reported to work. Let me ask a different question. Let's say that Officer X is assigned to work a certain shift. Yes. And then Officer X gets an email saying, okay, we know you don't feel like you can make that shift, so I'm telling you now that Officer Y will be fulfilling that shift. And then Officer Y shows up 30 minutes late for that shift. Who is responsible for the fact that the first 30 minutes of that shift there was no officer there? Officer X or Officer Y? Officer X, and here's why. The department has presented evidence. Can you point me to something in the record that shows, as a matter of Capitol Police regulation, policy, standard operating procedure, Officer X is on the hook. After he's been told that Officer Y is going to be fulfilling the shift, that it's still Officer X that is responsible for Officer Y's tardiness to the shift. Yes. The department presented evidence that it has disciplined officers in just the situation you described. That evidence is located at Appendix 785 and 799. In both of those cases, an officer believed he had a person coming in to work his shift as a substitute, but he entered into a private agreement. In other words, just as you described, receiving some sort of communication. Well, this one wasn't a private agreement between law and CONSOS. It was an email from somebody else in the police department. Another officer. And let's say that it's also clear from the record that Sergeant Floyd knew about this reassignment of the shift from CONSOS to law. Let's be clear. Only a sergeant has, not only a sergeant, only a department official has the responsibility for reassigning a shift. So even though the department allows substitutes to work for other employees. What do you mean by an official? A sergeant is not an official? An official is anyone above the sergeant level and above. So we make a distinction between officials, which are our management personnel, and our officers. So the fact that Sergeant Floyd knew about this reassignment doesn't matter? I would say that the fact that Sergeant Floyd at some time learned that someone was supposed to be coming in for Officer CONSOS is irrelevant. They were waiting for someone to show up for Officer CONSOS so that they can then switch out those two officers. There is no evidence in the record that at any time anyone said to Officer CONSOS, you may leave. As a matter of fact, Officer CONSOS admitted that no one came for that. I see you getting into your rebuttal, but let me just ask another question. Why is it when the warning letter was issued and the grounds for the warning letter, there was no accounting for the fact that Officer Law, in fact, fulfilled the shift? Maybe he was a little late, but there's no discussion, no explanation, no weighing of that fact in terms of whether or not there was an absence without leave. Sure, because the question before Captain Bollinger, the official who issued the written warning, was whether or not Officer CONSOS was absent without leave at the time he left. That would be at 7.15 a.m. There's no question that he was. When you say there's no question that he was, you're assuming the conclusion when you say that. Let me explain. The whole question is, was he absent without leave? Now we have to figure out, okay, what are the facts that might support that conclusion? Here are the facts, and it's undisputed in the record. He was ordered to stay. He said he was not going to stay. He was told he could 1301 it away. He left before any substitute arrived, and no one at any point told him he could leave at 7.15 a.m. There's absolutely nothing in the record that suggests that an officer can determine when he wants to leave without receiving the consent of a supervisor to do so when he has been ordered to work. That's why I say that he was absent without leave, and there is no facts that dispute those facts. Beyond that, Officer Law was not working at the time that Officer CONSOS left. So for that reason, the question before Captain Bollinger was whether or not at 7.15 a.m. Officer CONSOS was absent without leave, and based on the evidence of the record, including evidence that showed For how long was he absent without leave, just so I know in my own mind? He would have been absent without leave from the time that he left at 7.15 a.m. At 7.15, right? To the time that Officer Law reported, which would have been 8.15 a.m. So if Officer Law had shown up at 7.16 a.m., then Officer CONSOS would have been AWOL for one minute? Absolutely. This is a law enforcement organization. We cannot have a situation where officers just clock out and leave their posts without notifying anyone and leaving that post vacant. That is not allowed in our department. And that's why he was disciplined for being absent without leave. Well, then what is the relief that you are requesting? We are requesting that the decision of the board be vacated for the very reason that the evidence in the record does not support the conclusions that the board rested on. Specifically, the board determined that Officer CONSOS' protected activity of raising bargaining unit members' concerns about the additional duty drafts was a motivating factor in the department's treatment of Officer CONSOS. You believe it was absolutely clear in the charging documents that he was absent without leave for one hour as opposed to absent without leave for an entire shift? So the charging documents do not specifically say for what period of time that Officer CONSOS was absent without leave, but that's because it's irrelevant to the department. To the department, it's whether you reported at the time, place, and location that you were required to report to. It's undisputed that Officer CONSOS did not. Okay. Let's hear from the other side, and we'll save some rebuttal. Thank you. Mr. Odom. May it please the court. Before you is a decision from the Office of Appliance Board of Directors. This is an entity created by Congress composed of five lawyers from across the United States experienced in the area of labor and employment law who decide these cases. They are charged with maintaining labor peace in the legislative branch, and they have a lot of discretion not only in determining what a violation is, but the facts regarding it. The interesting thing about this statute is it actually gives priority to the hearing officer and that the board is subject to the same standard of review as this court is. In other words, they cannot overturn a hearing officer's decision if it is supported by substantial evidence. So they, again, when they looked at this record, I think what you see before you is a very carefully crafted decision that thoroughly examines the evidence, that considers the applicable law, and reaches a conclusion. If we cut to the chase, it now appears that the offense here was being absent without leave for a one-hour period. So why was the officer not absent without leave in that one-hour period? So the question is, is there evidence in the record supporting the board's conclusions, which I think there is. What do you see first of all? What is the evidence in the record to support the conclusion that he was not absent without leave for that one-hour period? You begin with the charge, which was he was absent without leave, and you look at the investigation that was conducted. The explanation initially offered by the Capitol Police is that there was a thorough investigation done, and that they reached that conclusion. I don't understand the argument. Can't you just become very factual to the point? I think the argument today has highlighted, isolated exactly what it is that the Capitol Police were saying, is there was a one-hour time period when your shift wasn't manned. First of all, there is insufficient evidence in the record for that, because there was a sham investigation done. Forget whether there was an investigation. I'll just take the facts, the core facts. The core facts are? That his shift ended at 7 or 7.15. 7 o'clock, yes. 7 o'clock. He left at 7.15. After being relieved by an officer. After? But his relief didn't turn up? No, that's not true. The station he was at, the reason why he stayed, his shift was over at 7 o'clock. He stayed to 7.15 because an officer came in to relieve him. There was a gap, was there not, of at least 15 minutes? When nobody was there? No, not at the shift that he was in. He was ordered to report to another station, and the evidence was that not... The law clocked in at 7.29, but because there was no station to report to at 7.29, because the CVC, the visitor center, doesn't open until 8.30, the only place they have to report to is at 8.15, which is when they start the screening. Let's look at this period between 7.15 and 7.29. Neither officer was present. Isn't that right? Well, whether there was another officer present, we don't know. We're talking about these two. We know what these two are, but because there was no investigation, because the officer who did the investigation never acknowledged that there was a 13-11 force... Well, the record is full of the position undisputed, as far as I could tell, that at least between 7.15 and 7.29, this position was not filled. Again, certainly there's evidence that law clocked in at 7.29, and at 7.15, consuls clocked out, but because there was no... And that's not disputed, and again, where in the record I couldn't find it anyplace, does it say that even though one clocked out at 7.15, the next one in at 7.29, they overlapped somehow? I don't think that's a matter in dispute, that there was no overlap. Well, what I do know is that what Sergeant Floyd, when he approved... We're just talking about what's in the record. Right. What's in the record is that Sergeant Floyd was okay. He knew that law was going to be late, and he told Lieutenant McBride that when he asked the question whether there was any manpower need, he said, I'm okay, I'm good. So whatever this 15-minute gap was, it doesn't seem to... Certainly it was not the reason that the discipline was issued. Is there any evidence in the record that someone, whether it's Sergeant Floyd or anyone else, told Officer Conzos at 7 or 7.15, yeah, it's okay for you to go now? There is no evidence, but there's also no... So now there's no evidence, and now we know that Captain Bollinger, who concluded that Officer Conzos was AWOL starting at 7.15, 7.16, maybe it doesn't matter whether or not Officer Law ever showed up at a later point in time because of the fact that at that moment in time, Officer Conzos walked out the door knowing that there was no one to replace him. The evidence of the record, at least from Officer Conzos, was that no one ever calls into the sergeant. If you have a substitute that's replacing you, you don't call your supervisor and say, can I leave at the end of my shift? I mean, no one has ever done that in the history, and certainly no one has ever been disciplined for that. There is no record of anyone ever being disciplined for leaving your shift at your scheduled time, knowing that there's a qualified substitute that's going to handle the unscheduled shift that you had been suddenly given. So that's what the evidence shows, and I think that's what the board relied on and the hearing officer relied on to say this is pretext. I mean, the reason you gave in the command discipline was not true. I mean, you didn't look even to see whether there was a qualified substitute, even though your policy says you could qualify a substitute. To me, it comes back to the question of whether or not the time period was – the question was, was he absent without leave, and is there substantial – obviously the hearing examiner and the board concluded he was not absent without leave. So they're listening to the evidence about what you're saying is there aren't any written requirements, you're not required to be signed out. Once you know somebody's coming, it's okay to leave. They knew somebody was coming. The sergeant knew somebody was coming. So that's your view of the substantial evidence to support the conclusion, right? That's correct. And the other side is coming in now and saying, well, on this specific point, they're trying to make me believe that there are requirements and that if you leave without being told it's okay to leave, then you're AWOL. And I think that point was very much in dispute during the hearing, and I think the way the hearing officer resolved it is that it's not the way it works, that you're not required to call that certification. To your knowledge, are there any written requirements that say if you're being substituted 1301, you may not leave your position until you are granted permission to leave by a sergeant or higher? There is nothing in writing about that. In fact, there were no written requirements that really deal with these last-minute substitutions. Yeah, I thought the 1301 policy applies. It's only contemplating situations where you learn about your new assignment to some shift more than 24 hours ahead of the beginning of the shift. So for Officer Conzo's situation where he learned about it an hour before the new shift started wouldn't necessarily fit within the 1301 policy as it's expressed. Is that right? I think it's fair. I think the record established that the right to qualified substitution exists even on these last-minute substitutions, but there isn't any established procedure in terms of when you have to get the form in or anything like that. That's what the policy has to deal with, that if you know well in advance, then you have to get the form in within 24 hours. In this case, there was an actual 1301 papered up after the fact, but it was papered up so that the record shows that there was a substitute who served. Correct. That's correct. If you have nothing further. Okay, you've left a little time for your colleague. Are you directing us in a different direction? I would like to, but I would also just like to take a minute and perhaps go back to Judge Chen's hypothetical. Then I'll go in a different direction if that's okay. All right. Use your time as you see fit. All right. Thank you, Your Honor. Good morning, and may it please the Court. My name is Sarah Fahlman, and I'm honored to be here today to represent the intervener, the United States Capitol Police Labor Committee. Before I turn to the importance that this case has for the Labor Committee, I would, as I mentioned, like to address Judge Chen's hypothetical. In that, he said, what happens if Officer X is assigned, Officer Y is then going to step in, but Y shows up late? And counsel for the Capitol Police stated, oh, it would be Officer X's fault. Well, the record evidence is clear, and the hearing officer considered this evidence that that's not true. And if you look at- They say it's his fault if he leaves the station totally unguarded, and as you know, these are difficult times that we live in. And there was at least that period from 7-15 to 7-29 when there was no one guarding this station. I think that's undisputed in the record. Well, if you look to the two examples that I'm going to point you at, which are at APPX- Let's talk about this case. Okay. Well, here, but it has a direct relevance here, because in those instances, the post went completely unmanned, and what the Capitol Police did is they ended up disciplining the officer who had agreed to be the substitute, not the officer who had arranged for the substitute. Because he didn't wait for his substitute to appear. But if you look also at the record, in the numerous 1301s that have been admitted into evidence, there is no evidence in the record that shows that officers have to wait and do a kind of man-to-man exchange. The general practice is just as Officer Conzos followed. You have a substitute arranged. You assume that substitute is going to comply with what they have promised, the Capitol Police, they will do, and show up. And so when Officer Conzos checked out at 7-15, he had been told that he had a proper substitute. The department knew by 7 o'clock, Lieutenant McBride had confirmed with Sergeant Floyd that he knew he had a substitute coming in. And so I would submit that on the evidence that the hearing officer considered, Officer Conzos followed the procedures that were required by the Capitol Police and so could not have been AWOL. Is it your view that Officer Law was AWOL from 7 a.m. to 7-29 a.m.? Unfortunately, there was no investigation into Officer Law. But just logically spinning out the fact pattern based on what you just said, why wouldn't Officer Law be considered AWOL? Logically spinning that out and looking at the discipline that the Capitol Police has issued to officers in the past, it appears that Officer Law would have been the one to have been under investigation. And I think that brings us to why we're here today, and that it wasn't Officer Law. It was Chairman Conzos. And why was it Chairman Conzos? It was Chairman Conzos because he communicated directly with then-Police Chief Stein about the problems that exist for Capitol Police officers when they are held over. Maybe that's why. But we really need to answer the question of whether it's appropriate. This Capitol Police, that is an extraordinarily responsible position. It is. And for a person to walk away before the replacement arrives is something that you can't shrug off. No matter what else, no matter what rationale one looks for in the relationships and the concerns you tell us in the briefs that he's complained about the system of being asked to work two consecutive shifts. Whether that was the reason perhaps the statement was being made has nothing to do with what happened. The question is we know what happened. We know there was this 15-minute period at least where the position was unfilled. The question is, is there any authority to discipline the person who lets that happen? And you say no. I say no. I say under the way the Capitol Police implements the 1301 program in practice for these emergency holdovers, which is different from when you have more than a 24-hour notice, it is a different situation. And the way the Capitol Police has in the past treated these situations, the way the officers have a system designed where that they can find these very fast 1301 substitutes, that what Officer Konzos did was not against Capitol Police procedures and should not have subjected him to discipline. And I think the hearing officer had to— But why is it that for the Capitol Police to decide? We had a two-day hearing where a hearing officer heard all of the information from the Capitol Police and heard the information from Officer Konzos and found based on what he heard that Officer Konzos simply was not AWOL. And we're here today. We have to give that some deference if there is any substantial evidence in the record. And I think what we've been through showing that Officer Konzos had relief arranged. His supervisor knew the relief was arranged. His relief appeared. His relief was paid for the entire shift. All of that evidence is, frankly, more than substantial and supports the hearing officer's well-reasoned decision that Officer Konzos was not AWOL. And because he was not AWOL, that supports a finding that his protected union activity was a motivating factor in the department's actions. Is there some kind of regulation or policy within the Capitol Police that you know of where these shifts, transfers, happen all the time? One officer gets off a shift, a new officer comes on the shift? There was... Is there any kind of regulation or policy that says before any officer leaves his shift, he has to see with his eyeballs the new guy coming in before he can walk away from, even though his shift has ended? To my knowledge, there is no such policy. And the hearing officer actually considered over 75 different 1301s, these forms, that were not fully completed for emergency situations like this and that the United States Capitol Police had never had a problem with. Forms that were submitted after the fact. Forms that weren't signed by all parties. Forms that didn't have final supervisor approval. The fact is, this issue... is that there is not a turn, square, corners military set of rules that are firmly enforced in every case, especially in these instances where somebody's being told as they walk off a shift, you have to get somebody on. So it's casual. There probably are gaps. Correct. There probably are. In your view, if we're worried about making certain that the post is always occupied, the flaw is in the casualness of the lack of turning square corners requirements by the agency. And Officer Conza is in his capacity as chairman, had been in contact with the chief of police to try and work out and try and figure out a way to address this issue. And it had never been addressed. The only time the Capitol Police has come down on an officer for this kind of casual, daily, almost daily 1301 occurrence is, we think, quite notably the day that the chairman decided to raise the issue again with the chief of police. Of all the examples that were cited in the 1301s, the punishment was doled out either to somebody who didn't get a 1301 substitute or to a 1301 substitute who didn't show up on time. That's correct. Is that correct? That is correct. In the two examples that Ms. Indien pointed out at 785 and 799, in both of those examples, there was absolutely a PPX, 785 and 789. In both of those examples, nobody came in. There was absolutely no evidence that an actual 1301 had been arranged. In contrast here, where Officer Law did arrive and work the shift.  Thank you. Thank you, Your Honor. Yes. Ms. Jane Dune? If there were a system in place where there was a written requirement that says you may not leave, you're being a substitute coming in, 1301 process, but it is, you may not leave your post until you are signed out by an officer. Can you cite that? Is there a regulation to that effect? There is no specific regulation stating that you may not leave your post until you are signed out by another officer. There is specific regulation stating that an officer who is assigned additional duty must work that additional duty unless specifically excused by the department. That's in both the CBA and it's in the Qualified Substitute Parts. I understand you're supposed to serve if you're told that you have a shift. You're supposed to do it. There is in place a system for allowing for substitutes. Is that correct? There is, but that system intuitively has built in a process by which the officers choosing to or electing to transfer their shift to another person must get consent to do that. So as part of the substitution— Is there a requirement that says the consent has to be in writing before the shift occurs? There is a process by which it can be in writing. Is it required? I don't believe there's any evidence that it is required. You see where I'm coming from. We've now learned an awful lot about what went on. We finally narrowed it down to a very narrow time frame in question. From the point of view of your adversary and from the hearing officer, there seemed to be some evidence that the system for allowing the substitutes is sort of relaxed. I mean, it's not turning square corners with written requirements at every point along the way. There is— And that, in fact, here he was offered, he said, you may 1301 this if you want. That's just repeating what's already in the agreement. But he was told, a sergeant told him he could get a substitute. That's true, but that's exactly what the CBA spells out for any officer. At any time, they can get a qualified substitute. And a substitute was obtained not by Cosgrove. Somebody else found the substitute, right, Mr. Law? Mr. Ford or Officer Ford. And he's a sergeant? He's an officer. But his sergeant knows this is going on. So— Before Law shows up, a sergeant knows that this process is underway. The sergeant is aware at the time, the evidence shows, that at some point the sergeant became aware that another officer was supposed to be coming in for Officer Conzals. And that's before he showed up. That's before Officer Law showed up. That's part of what Lieutenant McBride's investigation uncovered. However, that does not in any way excuse Officer Conzals from leaving his post at 715, that an officer at some point is supposed to arrive. But there's no requirement that he has to be signed out once he knows that somebody's coming to substitute. There is a requirement that he has to work it. And so getting a promise from another officer that somebody is supposed to be coming in and not having that essential consent piece handled before leaving is what the problem is in this case. And in the cases you cited to us where there's a glitch, it's somebody who has agreed to come in and serve. They're the ones that get penalized if they don't come in on time. Only when there is a 1301 form that is completed and signed. Because once you have that, that means that the responsibility for working that shift has been transferred to the substituting officer. I've identified two cases in which an officer entered into a private agreement, much like Officer Conzals, to have somebody work for them. Does 1301 apply in this circumstance, though, when the notice of the new shift is in less than 24 hours? So the 1301 policy does require 24 hours in advance to submit the notice. So for that reason, that portion of the policy likely does not apply. However, there is evidence in the record they still use the 1301 process. And critically here, Officer Conzals was told that he could 1301 it away, which is not what he did. So they're using a process in violation of its own terms. The term says 24 hours in advance. So they have a casual system for having substitutes. They sort of hive the formalistic 1301 into these last-minute change situations. They have a system by which an officer... Sounds pretty sloppy, doesn't it? No, they have a system by which an officer who is drafted for additional duty at the last minute, which is the way our business operates, when something arises that he can still get someone else to work for him if he needs to do so. And that's the system that was in place here. But the critical piece of that is you need consent. You cannot just walk off a post. There is no evidence in the record that allows somebody to walk off a post when they haven't gotten consent in advance. And that's what happened here. The idea that the sergeants knew that someone was coming in does not excuse Officer Conzals for leaving his post at 7 to 10. If you have a 1301 that was done 24 hours in advance and so your duty ended at 7 a.m., right, and it was all signed, sealed, and delivered in advance, could the officer leave at 7 a.m.? Absolutely, because he's transferred his responsibility to the second officer. So at that point... Stick with me for a second. But that's because the formalistic 1301 was complied with in advance. Absolutely. So the officer can walk off without being released, without being signed out, and he just can walk off. I want to be clear. The officer has been released. Once a 1301 form is completed, a supervisor has said this post is no longer your responsibility. You're helping me out a lot because we take this 1301 process into the current setting in this case where there's no 24 hours in advance. We don't have a written rule that says in this circumstance you can't leave until you're told to leave. Well... Help me. Sure, absolutely. Because when you agree that if there had been a 1301 that was signed, sealed, and delivered in advance, the officer can just walk out and say goodbye. The critical... And if the sergeant said, well, the other fellow isn't here yet, you can say, too bad, that's his problem. Right. The critical component here is consent. A 1301 form is one of the ways one can obtain consent. And so in this setting, a hearing officer, at least, and the board believed that there was a sufficient consent here because the officer was told he could 1301 it, somebody was found, not by him but somebody else, and they all knew that was going to happen. Right, going to happen down the road. At some point someone was coming in. But the nature of the consent here will be different than the nature of consent in a true 1301 where the consent is simply by signing the form. The issue here isn't that Officer Konzos did not have a 1301 form. So for us, that is not the issue. Was there or was there not consent? That is the issue, and it's absolutely critical to note that even Officer Konzos acknowledged there was no consent. He understood after he spoke with his Sergeant McElroy, who assigned him additional duty, even though Sergeant McElroy said, Hey, look, you can 1301 it away. He understood he still had to work. There is no evidence in the record that when an officer obtains via another officer confirmation that he will be having a substitute come in at some point, that at that point they can leave. There is simply nothing in the record that supports this. Does the Capitol Police still have the policy where at the last second at the end of someone's shift, the Capitol Police can tell them to stick around and do the next shift? Absolutely. It's part of our CBA agreement. Okay. I'm just curious. Okay. And let me just touch on that slightly. The reason why we do this is because there has been identified in the shift coming up that there are gaps in our ability to secure the Capitol, which is the number one terrorist target in the world. And so when we identify gaps, that's why we draft people to work additional duty. We do it in accordance with the collective bargaining agreement. So it's been a procedure that's been negotiated with the union, and that's the procedure by which Officer Conzos was drafted. There's absolutely no reason that he could not stay and continue working additional duty as he is required to do by the CBA. It specifically states that you can only not work additional duty if you're excused, and there's no evidence that that happened here. No one at any point said to Officer Conzos, you can leave. That did not happen. And when he left, there was no one working in his stead. That's absolutely not in dispute here. Moreover, the board and the FOP stated that there was evidence of 1301s that had been submitted that weren't completed. Again, the issue here isn't whether or not there was a 1301 completed or not. We know there was not. What it tells us is that there is not turning square corners. Actually, it doesn't. Over a long period of time, the 18, 19, 20 examples you've given us, to me display an absence of turning square corners in applying these rules. It doesn't even tell us that, because, frankly, those 1301s don't tell us anything beyond the fact that they're incomplete. We don't know if the substitutions occurred because there was no testimony as to those facts. Well, the fact that the agency accepted them even though they weren't completed and paid people for serving was a waste. We don't even know that. That's my point. We don't know that. All we have are forms that show different stages of completion. We don't know whether they were the final forms. We don't know that. We don't know if the substitutions occurred. We don't know whether the person was given consent or denied consent. We have no idea what those forms showed, in part because they were submitted two weeks after the hearing occurred, and no evidence was submitted as to their meaning besides the general counsel's own arguments as to what they mean. That is not substantial evidence. Okay. I think we have the issues as well as we can. Thank you all. Thank you for your time. The case is taken under submission.